## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CAROLYN WRIGHT,
*individually and on behalf of*
*all others similarly situated*,                    Case No. 18-cv-1062 (WMW/ECW)

                    Plaintiff,

                                                    **(UNDER SEAL)**
v.                                                  **ORDER**

CAPELLA EDUCATION COMPANY
and CAPELLA UNIVERSITY, INC.,

                    Defendants.

---

This matter is before the Court on Plaintiff Maurice Jose Ornelas's ("Ornelas" or "Plaintiff") Motion for Leave to File Second Amended Class Action Complaint (Dkt. 210) ("Motion to Amend"). For the reasons set forth below, the Court grants in part and denies in part the Motion to Amend.

## I.      <u>BACKGROUND</u>

### A.      **Procedural History**

Plaintiffs Carolyn Wright and Debbra Kennedy filed a "Class Action Complaint" initiating this action on April 20, 2018, alleging claims against Capella Education Company and Capella University, Inc. (collectively, "Capella" or "Defendants") on behalf of themselves and all other similarly situated doctoral students. (Dkt. 1 at 1, ¶ 1.)[1] The Complaint alleged that "Capella essentially operated a 'bait and switch' program,"

---

[1]      Unless otherwise noted, all page numbers refer to the CM/ECF pagination.

where "[t]he bait was displayed when Capella's marketing materials and recruiters misled prospective and current students making [sic] misleading statements about the time to completion and cost of their mostly student-loan financed doctoral degrees" and that "[i]nstead of completing the promised doctoral degree program requirements and being awarded a doctoral degree in the advertised time, Capella employed the 'switch,'" whereby "Capella created an endless routine of hurdles and benefitted from additional tuition payments." (*Id.* ¶¶ 1-2, 5.) The Complaint included allegations relating to Capella's profits, the student loan debt carried by Capella's students, and the length of time Capella said it would take to complete certain degree programs compared to the length of time it actually takes to complete the degree programs. (*See id.* ¶¶ 35-71.) The Complaint further included class action allegations and sought class certification. (*Id.* ¶¶ 95-105.) Plaintiffs Wright and Kennedy asserted claims for fraud in the inducement, unjust enrichment, breach of contract, violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, and breach of the implied covenant of good faith and fair dealing for nationwide classes and various state-specific alternative subclasses. (*Id.* ¶¶ 112-238.)

Capella moved to dismiss the Complaint on July 9, 2018. (Dkt. 14.) On August 20, 2018, Plaintiffs Wright and Kennedy, along with seven new named Plaintiffs, including Ornelas, filed a First Amended Class Action Complaint ("FAC"). (Dkt. 24.) Among other things, the FAC identified additional alternative subclasses and asserted new claims under the Minnesota Prevention of Consumer Fraud Act, Minn. Stat.

§ 325F.69, and other states' common law and statutes, with forty-five causes of action in total.  (*See generally id.* ¶¶ 234, 295-302, 384-742.)

Capella filed a Motion to Dismiss the FAC ("Motion to Dismiss") on September 24, 2018.  (Dkt. 38.)  On May 6, 2019, U.S. District Judge Wilhelmina M. Wright granted in part and denied in part the Motion to Dismiss.  (Dkt. 57.)[2]  In particular, the May 6, 2019 Order denied the Motion to Dismiss as to Ornelas's Minnesota and Massachusetts common-law and statutory fraud claims, which were based on "an email from a Capella recruiter that stated, '[o]ur typical learner will complete their PhD program in 3 years, plus or minus one quarter, by averaging 2 courses per quarter,'" where Capella's disclosure in a "Gainful Employment" report stated that the PhD in Public Safety sought by Ornelas took, on average, 6 years and 3 months to complete.[3] (*Id.* at 10-11, 16-17.)  The May 6, 2019 Order granted the Motion to Dismiss as to Plaintiffs' remaining claims, leaving Ornelas as the only named putative class representative.  (*See id.* at 22.)  The case has otherwise been proceeding with class certification discovery.

---

[2]     *Wright v. Capella Univ., Inc.*, 378 F. Supp. 3d 760 (D. Minn. 2019).

[3]     The May 6, 2019 Order states that the "Gainful Employment" reports (referred to in the Proposed SAC as a "Gainful Employment Disclosure") are public documents submitted to the U.S. Department of Education and are embraced by the FAC, and therefore can be relied on for purposes of a motion to dismiss.  (Dkt. 57 at 6 n.4.)

**B.     Proposed Second Amended Class Action Complaint**

Ornelas moved to amend the FAC on October 5, 2020.  (Dkt. 210.)  The parties

submitted memoranda (Dkts. 212, 229[4]); Capella filed two letters to clarify aspects of its

opposition, on November 2, 2020 (Dkt. 231) and November 3, 2020 (Dkt. 233); and the

Court held oral argument on November 4, 2020 (Dkt. 234).  On March 29, 2020, Capella

filed a notice of supplemental authority.  (Dkts. 248, 248-1, 248-2.)

The changes in the Proposed Second Amended Class Action Complaint

("Proposed SAC")[5]: name six new plaintiffs and detail their experiences as students at

Capella; add allegations about Capella's communications, including alleged misleading

statements, with prospective doctoral students; add allegations about Capella's

knowledge of information about whether, when, and with how much debt students

graduate, as well as knowledge of misrepresentations; add alternative subclasses

corresponding to the states of the new plaintiffs; add alternative subclasses based on

Capella's different doctoral programs or publications about doctoral programs; add

causes of action for various state-law claims corresponding to the states of the new

plaintiffs or based on proposed subclasses; add allegations that Defendants' conduct

---

[4]     Capella initially filed its opposition on October 19, 2020 at Docket Entry 226.  In
a letter filed on October 29, 2020, Capella informed the Court that it was filing a
corrected version of its brief, listed the corrections, and stated that Plaintiff had been
informed and did not object to the filing of the corrected version.  The Court has
therefore considered only the opposition filed on October 29, 2020 at Docket Entry 229.

[5]     The redline version of the Proposed SAC is labeled "Exhibit A" (Dkt. 215), and
the clean version is labeled "Exhibit B" (Dkt. 216).  (*See* Dkt. 212 at 2-3.)  For
convenience, the Court refers to the Docket Entries rather than the exhibit labels.

warrants punitive damages; and remove allegations related to claims that were dismissed in the May 6, 2019 Order.  (*See generally* Dkt. 215 (redlined Proposed SAC).) According to Plaintiff, the new allegations "are based upon documents produced to plaintiff through discovery, as well as counsel's ongoing investigation."  (Dkt. 212 at 2.) Plaintiff alleges the following in the Proposed SAC as relates to the new or revised allegations.[6]

### 1.   Allegations Regarding Student Debt and Graduation Rates at Capella

The Proposed SAC adds allegations related to the financial circumstances of Capella's doctoral students and those circumstances' effects on students completing their programs, as well as Capella's knowledge of those circumstances and effects.  A March 2015 internal Capella presentation "states that its learners will have 'a high debt load.'" (Dkt. 216 ¶ 61 (quoting Dkt. 218, Ex. 2 at 9).)  "80% of Capella's PhD learners 'will most likely run out of Stafford loan eligibility before completion,'" which "shows from the start of enrollment, Capella recognizes it is likely to lose 80% of its PhD students solely because the length of Capella's programs means those students have insufficient resources to complete their degree."  (*Id.* ¶ 59 (quoting Dkt. 218, Ex. 2 at 9).)  Reviewing the data in the document, the Proposed SAC alleges that by "the timeframe by which Capella promised Ornelas and Seppa that the 'typical learner' and 'average' student

---

[6]     The Proposed SAC also modifies allegations related to the identities of Defendants to change some of the allegations to the past tense and add that Defendant Capella Education Company was acquired by Strayer Education.  (*See* Dkt. 215 ¶¶ 28-31.)

graduated[, ]only 9.4% of its PhD students remained to re-enroll . . . meaning over 90% of its students did not graduate." (*Id.* (quoting Dkt. 218, Ex. 2 at 8).)

The Proposed SAC also includes new allegations, or phrases inserted into existing allegations, related to graduation rates from Capella's doctoral programs, some of which will be reviewed later in Section I.B.2-4 in the context of describing new allegations related to Capella's representations, Capella's knowledge of misrepresentations, and new plaintiffs. (*See, e.g.*, Dkt. 215 ¶ 1 (redline showing insertion of "graduation rate" into allegation stating, "This action seeks redress for Plaintiffs and thousands of similarly situated doctoral students who were harmed by Capella's misrepresentations about the graduation rate, length, and cost of its doctoral programs . . . ."); *id.* ¶ 8 (inserting "promises of the typical/average student graduating"); *id.* ¶ 9 (inserting "graduation rate"); *id.* ¶ 19 (similar); Dkt. 216 ¶ 59 (alleging that "over 90% of its students did not graduate" and "[t]he 'typical' and 'average' student at Capella then does not graduate"); *id.* ¶ 67 ("These form misrepresentations all delivered the same message: 1) that the average or typical doctoral student graduated from Capella (i.e., more than 50% of its students graduated . . . ."); Dkt. 215 ¶ 217 (in class allegation, inserting "false completion rates"); *id.* ¶ 219(c) (in class allegation on commonality and predominance, inserting common question of "Whether, with knowledge of its abysmally low doctoral program completion rate, Capella made false representations to its students about the typical/average graduation rate for doctoral programs at Capella"); *id.* ¶ 224 (inserting

text about "completion rates" into allegation on tolling and estoppel); *see also infra* Sections I.B.2-4.)[7]

### 2. Allegations Regarding Capella's Representations of Time to Complete and Completion of Doctoral Programs

The bulk of the new allegations in the Proposed SAC relate to Capella's representations to prospective students regarding the time to complete doctoral programs, specifically "promis[ing] that obtaining a doctoral degree was not only typical, it was relatively inexpensive and quick." (Dkt. 216 ¶ 66.) "This was accomplished through multiple form email misrepresentations, as well as form misrepresentations made telephonically and via CHAT options with prospective students." (*Id.*) "These form misrepresentations all delivered the same message: 1) that the average or typical doctoral student graduated from Capella (i.e., more than 50% of its students graduated) and 2) that the timeline for graduating was relatively fast . . . ." (*Id.* ¶ 67.)

The Proposed SAC first presents allegations related to what Plaintiff calls "typical learner" form emails, which Capella recruiters sent to prospective students for, among other programs, the PhD in the Schools of Public Safety (the program Ornelas attended), Psychology, Public Service Leadership, and Human Services. (Dkt. 216 ¶ 68 (citing or quoting Dkt. 217-2, Ex. 4; Dkt. 218-1, Ex. 5; Dkt. 218-2, Ex. 6; Dkt. 218-3, Ex. 7; Dkt. 218-4, Ex. 8).) These emails all contain the representation, "Our typical learner will complete their PhD program in 3 years, plus or minus one quarter, by averaging 2 courses

---

[7]    Some allegations about graduation rates already appear in the FAC. (*See* Dkt. 215 ¶ 58 ("Capella appears to have an abysmal graduation rate for doctoral students . . . .").)

per quarter.  Their weekly time investment to work at this pace is about 18-24 hours per week."  (*Id.* (quoting Dkt. 217-2, Ex. 4); *see also id.* (citing Dkt. 218-2, Ex. 6).)  "The 'typical learner' email misrepresented both that the 'typical' Capella student would graduate, and that the 'typical' student would graduate within a relatively quick time," since "[d]espite these promises to prospective PhD students, Capella's 'typical learner' would not obtain a degree, let alone obtain a degree in three years.  Again, Capella internal documentation recognized that over 90% of its students would be unenrolled by the end of the third year."  (*Id.* ¶¶ 69-70.)  "Capella has produced over 1,300 emails containing the 'typical learner' language; however, this production does not fully document the sheer number of these emails sent to prospective doctoral students," because, for example, "Plaintiff Ornelas received two such emails from Capella," but "Capella was only able to locate and produce one such email," and "nearly every named Plaintiff in this action has an email from Capella with misrepresentations that Capella was unable to find and produce during discovery."  (*Id.* ¶ 72 (citation omitted).)  "The reason for Capella's inability to locate so many of these misrepresentation emails was provided in Plaintiff Ornelas's enrollment counselor's deposition: she confirmed that she regularly deleted work emails."  (*Id.* (citation omitted).)  "As can be seen then, Capella's production of 'typical learner' emails (indeed, all its misrepresentation emails) underestimates the universe of emails sent to its doctoral prospects."  (*Id.*)

The Proposed SAC next presents allegations related to what Plaintiff calls "typical time to completion" form emails, which Capella recruiters sent to prospective students for at least the PhD in the Schools of Business and Information Technology.  (*Id.* ¶ 73.)

These emails contain statements with the phrase "typical time to completion," such as, "Typical time to completion is anywhere from 3.5 to 5.5 years to complete, 4 to 4.5 is average." (*Id.* (citing Dkt. 218-6, Ex. 11 at 2).) "All misrepresentations made within the 'typical time to completion' emails are false." (*Id.* (citing Dkt. 217-3, Ex. 9 (data from Gainful Employment Disclosure on how many months program "is designed" to be completed in and stating that fewer than 10 students completed programs in 2014-15)).) "[I]nternal emails confirm [the 'typical time to completion' misrepresentation] was used by recruiters not just in their emails with prospective doctoral students, but also as a 'Canned Response' used by 'chat reps' when communicating via 'chat/phones'" with prospective doctoral students. (*Id.* ¶ 74 (citing Dkt. 218-6, Ex. 11; Dkt. 218-7, Ex. 12; Dkt. 218-8, Ex. 13).) "[I]t should be emphasized: misrepresentations made by Capella recruiters in one form (e.g., email) were also made in other forms (e.g., via CHAT/phones)." (*Id.*)

The Proposed SAC next presents allegations related to what Plaintiff calls "average degree completion" time form emails, which Capella recruiters sent to prospective students for doctoral programs in the Nursing School. (*Id.* ¶¶ 75-76.) These emails state "the 'average degree completion' time for Capella was from 2-4 years," which "[l]ike with both 'typical' misrepresentations above, . . . focused on both completion rate of students and time to completion." (*Id.* ¶ 75.) "These representations were similarly false. For example, it appears only 1.3% 'finished in 30 months'." (*Id.* (footnote omitted) (citing Dkt. 217-4, Ex. 15).)

The Proposed SAC next presents allegations related to misrepresentations about the length of time it takes to complete a dissertation: Capella "had form documents, which misrepresented that the average student would complete the dissertation and do so in two years or less." (*Id.* ¶ 79.) "For example, attached to Capella recruiter emails (which contained misrepresentations themselves) were Capella brochures for Business and IT Programs" that "for years misrepresented that 'Dissertation Courseroom milestones take, on average, four to eight quarters to complete,'" or "on average between one to two years." (*Id.* ¶ 80 (citing Dkt. 217-4, Ex. 16 at 13; *id.* Ex. 17 at 25).) "Further, many Capella doctoral students were provided 'Roadmaps' that provided a 'summary statement' as 'an estimate to assist you with your enrollment decision.' These documents—which expressly state they were to be relied upon—misrepresented that, 'The average time to completion for the Comprehensive/Dissertation phase is approximately two years.'" (*Id.* ¶ 81 (quoting Dkt. 217-4, Ex. 18).) "Considering 90% of Capella doctoral students did not graduate, the 'average' Capella student could not have completed the dissertation, and therefore certainly did not so do in two years." (*Id.* ¶ 82.)

The Proposed SAC next presents allegations related to what Plaintiff calls "average time to completion range" emails, which Capella recruiters sent to prospective students for doctoral programs in the School of Education and which stated, for example, "'Average time to completion range is 2.75 to 3.5 years depending on your capstone project research.'" (*Id.* ¶ 84 (quoting Dkt. 218-10, Ex. 19 at 2).) "Another form email is 'Generally the PhD is about a 3 year program,'" and "Capella also used the same

timeframe with modified language for other prospective doctoral students in the School of Education." (*Id.* (quoting Dkt. 218-10, Ex. 19).) "Such representations are false as Capella confirms 1) '0% finished' the Doctor of Education ('EdD') program within 36 months, and 2) it appears less than 5.8% did so within 84 months." (*Id.* ¶ 83 (footnote omitted) (citing Dkt. 217-3, Ex. 9).)

"And beyond the form emails discussed above, Capella utilized additional templates/form emails that were shared among enrollment counselors through Capella's ONE NOTE system." (*Id.* ¶ 84 (citing Dkt. 218-11, Ex. 21).) "Script responses were also provided for enrollment counselors ('ECs') for 'top objections' they may face from prospective students, including objections having to do with 'average time.'" (*Id.* (citing Dkt. 218-12, Ex. 22).) "The take home is Capella's common misrepresentations about completion rate and time were rampant, made to doctoral students through all communication methodologies available to Capella enrollment counselors, and Capella's production vastly underestimates the actual number of misrepresentations . . . ." (*Id.* ¶ 85.) "Common sense confirms, however, that misrepresentations were made to all Capella doctoral students, whether by email, CHAT, or via phone." (*Id.*)

### 3.   Allegations Regarding Capella's Knowledge of False Representations

The Proposed SAC alleges, "Capella knew its misrepresentations were false." (*Id.* ¶ 86.) Excerpting from the deposition of Capella enrollment counselor Josh Koski, the Proposed SAC alleges that Koski testified "that enrollment counselors were not provided average degree completion times by Capella (even though it was a phrase he used over 800 times in emails with prospective doctoral students)," and "in his decade plus career at

Capella, Mr. Koski could not remember ever being provided such information."  (*Id.* ¶ 87 (citing and quoting Dkt. 218-13, Ex. 23 at 78:16-80:14).)  "Capella has already produced materials confirming Capella knew these specific misrepresentations described/listed above, were false.  For example, enrollment counselors recognized the 'typical learner' statement misrepresented Capella's timeframe, but still used these form misrepresentations for years."  (*Id.* ¶ 88 (quoting Dkt. 218-14, Ex. 24); *see also id.* ¶ 89 (quoting Dkt. 218-15, Ex. 25; Dkt. 218-16, Ex. 26) (enrollment counselor stated average cost of PhD in IT was higher than cost quoted to prospective students but "[d]espite knowing the $75,000 estimate was incorrect at least as early as 2013, Capella nonetheless continued using a $75,000 estimate as the average cost to complete its degrees").)  "Capella also recognized that its dissertation process was the leading cause of doctoral students not graduating.  Despite this, Capella falsely represented the average student completed the dissertation in 1-2 years."  (*Id.* ¶ 90 (quoting Dkt. 218-17, Ex. 27).)

"So few doctoral students graduated from Capella" that Capella recruiters could not identify graduates of particular programs or stated internally that there were no graduates.  (*Id.* ¶¶ 91-93.)  "Worse, internal communications confirm Capella's knowledge that some of its programs took seven years *on average* to complete, and that this information should be withheld from prospective students."  (*Id.* ¶ 94 (quoting Dkt. 218-20, Ex. 30 (stating, in part, "for new learners coming into the program, the traditional Psych PhD DOES take, on average, seven years to complete with dissertation")).)  "A seven-year average graduation rate is ridiculous not only because of its obscene length, but because Capella's maximum time for enrollment is seven years after which it un-

enrolls students," so "the 'average' student would be unable to obtain a degree prior to being un-enrolled by Capella," yet Capella represented that the PhD in Psychology would take "three years plus or a minus a quarter." (*Id.* (citing Dkt. 218-20, Ex. 30; Dkt. 218-2, Ex. 6 at 2).) Capella also "documented that 80% of its PhD students are 'financially at-risk' from enrollment" and "recognized that it would lose 90% of its PhD enrollment within three years" yet "continued to falsely represent that the 'typical' or 'average' student at Capella would graduate and do so relatively quickly." (*Id.* ¶ 95 (quoting Dkt. 218, Ex. 2).)

"Capella was also aware that it was reasonable for prospective doctoral students to rely upon its 'time to completion' misrepresentations" and "recognized the length of time a program takes—which directly affects cost—is the "#1 decision making factor for PhD prospects." (*Id.* ¶ 96 (citing Dkt. 218-21, Ex. 31 at 2; Dkt. 218-15, Ex. 25 at 2).) The Proposed SAC further alleges that Capella's enrollment staff would not and did not investigate misrepresentations. (*Id.* ¶ 97.) "Capella is therefore aware of its many years of misrepresentations, and yet will do nothing about them." (*Id.* ¶ 98.)

### 4.    New Plaintiffs

The Proposed SAC removes allegations related to former plaintiffs whose claims were previously dismissed and, in their place, adds or modifies some allegations related to Ornelas, and adds new allegations about the six proposed new plaintiffs. (*See, e.g.*, Dkt. 215 ¶ 2 (redline showing removal of allegations related to Wright and Kennedy and addition of allegations related to Ornelas, Proffitt, Seppa, Carty, Gore, and Powers).) Regarding Ornelas, the Proposed SAC adds details about the emailed representations he

received from Capella, including receiving the "typical learner" email representation described above twice.  (Dkt. 216 ¶¶ 101-02 (quoting Dkt. 217-2, Ex. 4).)  The Proposed SAC alleges, in part, the following regarding the proposed new plaintiffs.

April Powers, a resident and citizen of Idaho in 2015 and of Utah from 2015 to 2019, attended Capella's PhD in Information Technology ("PhD in IT") program from 2015 to 2019.  (*Id.* ¶¶ 22, 116-17.)  "On March 13, 2014, prior to her enrollment, Plaintiff Powers received an email from Capella enrollment counselor Andy Covert (a Capella recruiter located at Capella's headquarters in Minneapolis) stating that the 'Typical time to completion after transfer credit is anywhere from 3.5 to 5.5 years in length.'"  (*Id.* ¶ 118 (quoting Dkt. 217-5, Ex. 35).)  This "form email also estimated the costs of a PhD in IT degree at below $4,665 a quarter for coursework, and a decreased charge of $4,175 during the dissertation process," so "[t]he 'average' PhD in IT degree would therefore cost approximately $75,000 should a student attend Capella for 4-4.5 years."  (*Id.* ¶ 120 (quoting Dkt. 217-5, Ex. 35).)  "The message of a short time to graduation was reinforced on March 4, 2015, when Recruiter Covert sent another form email to Plaintiff Powers with the" same language as the previous email.  (*Id.* ¶ 121 (quoting Dkt. 217-5, Ex. 36).)  "Plaintiff Powers relied upon these representations when enrolling at Capella, and when re-enrolling each term."  (*Id.* ¶ 122.)

"These representations were false."  (*Id.* ¶ 123.)  "Rather than being a program the 'typical' student completed in 3.5 years (42 months) and the 'average' student graduated within 4 to 4.5 years (48 to 54 months), Capella admitted in December 2015 that the program was actually 'designed to take 75 months,'" where "only 67% of the lucky few

14

(believed to be 10% or less) that graduated" did so "in under 6 years and 3 months (75 months)." (*Id.* ¶ 124 (quoting Dkt. 217-5, Ex. 37).) "This is a far worse success rate (less than 10% graduation as compared to the 'typical' or 'average' student graduating) and time to completion (6 years, 3 months compared to 4-4.5 years) then represented to Plaintiff Powers." (*Id.*) Capella knew the representations were false and internally acknowledged that costs were higher than quoted. (*Id.* ¶¶ 125-26.)

Plaintiff Powers began the dissertation process, but Capella delayed her process. (*Id.* ¶¶ 127-29.) "Despite the promise that the 'typical' and 'average' student completes his or her PhD, Plaintiff Powers was forced to withdraw without receiving her doctoral degree." (*Id.* ¶ 130.)

Stephen Seppa, a resident and citizen of Florida, attended Capella's PhD in Education program from 2007 to 2010. (*Id.* ¶¶ 133-34; *see also id.* ¶ 23 (stating that Seppa enrolled in 2015).) "On June 22, 2007, prior to his enrollment, Plaintiff Seppa received a form email from Capella recruiter Jules Nyquist (an enrollment counselor located at Capella headquarters in Minneapolis) stating that 'Most doctoral learners complete the program in 3-4 years' and 'How long does it take? Three years is the average.'" (*Id.* ¶ 135 (quoting Dkt. 217-4, Ex. 20).) The email "also stated the 'total cost is *usually* between $46,000-$53,000.'" (*Id.* ¶ 136 (emphasis added in Proposed SAC) (quoting Dkt. 217-4, Ex. 20).) "As the 'average' Capella student graduates in 3-4 years, this would mean the 'average' student would pay between $12,500 to $15,333 a year." (*Id.*) "Plaintiff Seppa relied upon these representations when enrolling at Capella, and when re-enrolling each term." (*Id.* ¶ 138.)

"These representations were false." (*Id.* ¶ 139.) "Rather than being a program in which 'most' students could complete in 3-4 years or the 'average' student being able to complete in 3 years, Capella admitted in January 2016 that the program was 'designed to take 84 months,'" with only 58% of students (of the "lucky few" who graduated at all) graduating "in under seven years," where the number of students graduating at all is "believed to be 10% or less." (*Id.* ¶ 140 (quoting Dkt. 217-5, Ex. 38).) "This is a far worse success rate (less than 10% graduation as compared to 'most' or the 'average' student graduating) and time to completion (seven years compared to 3-4 years)." (*Id.* ¶ 140.) "Further, given the program was 'designed' to take 84 months, the 'average' cost would not be $46,000-$53,000, but rather $87,500-$107,333." (*Id.* ¶ 141.)

Plaintiff Seppa began the dissertation process but "suffered many delays, received inconsistent feedback and instructions, and received significantly less guidance from his doctoral capstone/dissertation committee." (*Id.* ¶¶ 142-43, 147.) "[T]urnover in the dissertation process led to delays" when "two of his dissertation committee members announced they were going to retire, forcing Plaintiff Seppa to spend months trying to find new replacements." (*Id.* ¶¶ 144-45.) "Despite the promise that 'most' and 'average' student [sic] completes his or her PhD, Plaintiff Seppa was forced to withdraw without receiving his doctoral degree." (*Id.* ¶ 146.)

Danielle Miller, a resident and citizen of Illinois, attended Capella's PhD in Nursing Education program from 2012 to 2019. (*Id.* ¶¶ 24, 150-51.) "On Dec. 29, 2011, prior to her enrollment, Plaintiff Miller received an email from Capella recruiter James Anderson (an enrollment counselor located at Capella headquarters in Minneapolis)

16

stating that 'On average, with full transfer credits and taking 2 courses per quarter (you can take quarters off) it will take 3-3.5 years.'"  (*Id.* ¶ 152 (quoting Dkt. 217-5, Ex. 39).)  "Plaintiff Miller relied on this representation when enrolling at Capella, and when re-enrolling each term."  (*Id.* ¶ 154.)

"This representation was false."  (*Id.* ¶ 155.)  "Rather than being a program in which the 'average' student would complete the degree and do so within 3-3.5 years was false [sic].  Capella admitted in January 2016 that the program was 'designed to take 84 months,' through which [sic] it is believed to be only 10% or less of those enrolled would graduate."  (*Id.* ¶ 156 (quoting Dkt. 217-5, Ex. 40).)  "This is a far worse success rate (less than 10% graduation as compared to the 'average' student graduating) and time to completion (seven years compared to 3-3.5)."  (*Id.*)

Plaintiff Miller began the dissertation process but "suffered many delays, received inconsistent feedback and instructions, and was guided incorrectly by her doctoral capstone/dissertation committee."  (*Id.* ¶¶ 157-58, 162.)  "Inconsistent decision making" led to delays when "after Plaintiff Miller's topic had been approved for an entire year, a member of her dissertation committee required her to change the topic, requiring Plaintiff Miller to start the dissertation over."  (*Id.* ¶¶ 159-60.)  "Despite the promise that the 'average' student completes his or her PhD, Plaintiff Miller was forced to withdraw without receiving her doctoral degree."  (*Id.* ¶ 161.)

Dannie Gore, Jr., a resident and citizen of Minnesota and Arizona, attended Capella's PhD in Business Management program from 2017 to 2018.  (*Id.* ¶¶ 25, 165-66.)  "On July 10, 2017, prior to his enrollment, Plaintiff Gore received an email from Capella

17

enrollment counselor Jessica Jacobson (an enrollment counselor located at Capella headquarters in Minneapolis) stating that the 'Typical time to completion is anywhere from 3.5 to 5.5 years in length; 4 to 4.5 years is pretty average.'" (*Id.* ¶ 168 (quoting Dkt. 217-5, Ex. 41).) "Attached to Plaintiff Gore's email was a PhD in General Business Management brochure which stated 'Dissertation Courseroom milestones take, on average, four to eight quarters to complete.' In other words, this brochure informed prospective doctoral students that the average PhD these [sic] would be completed in 1-2 years." (*Id.* ¶ 170 (quoting Dkt. 217-4, Ex. 16).) "Plaintiff Gore relied upon these representations when enrolling at Capella, and when re-enrolling each term." (*Id.* ¶ 171.)

"These representations were false." (*Id.* ¶ 172.) "Rather than being a program the 'typical' student completed in 3.5 years (42 months) and the 'average' student graduated within 4 to 4.5 years (48 to 54 months), Capella admitted in December 2014 that the program was actually 'designed to take 57 months,' with 'fewer than 10 students' actually completing the program in 2013-2014 . . . ." (*Id.* ¶ 173 (quoting Dkt. 217-5, Ex. 42).) "Capella then knew the representations it made to Plaintiff Gore and other prospective doctoral students were false at the time they were made." (*Id.* ¶ 174.)

Plaintiff Gore began the dissertation process but "suffered many delays, received inconsistent feedback and instructions from his dissertation committee and instructor, and was guided incorrectly by his doctoral capstone/dissertation committee." (*Id.* ¶¶ 175-76, 178.) "[T]urnover on his dissertation committee led to delays in the dissertation process." (*Id.* ¶ 177.) "Despite the promise that the 'typical' and 'average' student

completed his or her PhD, Plaintiff Gore was forced to withdraw without receiving his doctoral degree." (*Id.* ¶ 179.)

Erica Carty, a resident and citizen of Florida, attended Capella's BSN to DNP program from January 2017 to January 2019. (*Id.* ¶ 26, 182-83.)[8] "On July 25, 2016, prior to her enrollment, Plaintiff Carty received a form email from Capella recruiter Bridget Rewitzer (an enrollment counselor located at Capella headquarters in Minneapolis) stating the 'average' time to complete for her nursing program was three years." (*Id.* ¶ 184 (quoting Dkt. 217-5, Ex. 43).) "Plaintiff Carty relied upon her enrollment counselor's representations when enrolling at Capella, and when re-enrolling each term." (*Id.* ¶ 186.)

"These representations were false." (*Id.* ¶ 187.) "Shockingly, Capella recruiters are not provided 'average degree completion times' by Capella." (*Id.* ¶ 188 (citing Dkt. 218-13, Ex. 23 at 78:16-80:14 (deposition of Capella enrollment counselor Josh Koski)).) "Despite not being provided such information, internal Capella communications confirm that enrollment counselors, including Rewitzer, were instructed by Capella to provide 'average times to completion' to prospective doctoral students." (*Id.* ¶ 189 (citing Dkt. 218-25, Ex. 45).) "Further, so few doctoral students graduated from the program Plaintiff Carty was interested in that when another prospective learner asked a Capella enrollment

---

[8]     Paragraph 26 states that Plaintiff Carty enrolled in January 2017, while Paragraph 183 says she attended "from Jan. 2016." (Dkt. 216 ¶¶ 26, 183.) Given the allegation in paragraph 26, that the Proposed SAC also alleges that Plaintiff Carty received an email in July 2016 "prior to her enrollment," and that this email is attached to the Proposed SAC and is dated July 2016, it appears the reference to January 2016 in paragraph 183 is an error. (*See id.* ¶¶ 26, 184 (quoting Dkt. 217-5, Ex. 43); Dkt. 217-5, Ex. 43 at 28.)

counselor to speak with a BSN to DNP graduate, the recruiter could not identify one."
(*Id.* ¶ 190 (citing Dkt. 218-15, Ex. 25).)[9]

Plaintiff Carty began the dissertation process but "suffered many delays, received inconsistent feedback and instructions, and was guided incorrectly by her doctoral capstone/dissertation committee." (*Id.* ¶¶ 191-92, 195.)  The delays included that "Dr. Maryloise Lacey (Plaintiff Carty's mentor and Capstone I instructor) was replaced after giving Plaintiff Carty an unsuccessful grade that Capella later rescinded after an appeal" and that "Plaintiff requested a change from Spencer Langenhop, an assigned Academic Coach, to a prior instructor (Walter Ostander) because Mr. Langenhop was condescending and accusatory." (*Id.* ¶¶ 192-93.)  "Despite the promise that the 'average' student completed their BSN to DNP degree in three years, Plaintiff Carty was forced to withdraw without receiving her doctoral degree." (*Id.* ¶ 194.)

Jennifer Proffitt, a resident and citizen of Michigan, attended Capella's PhD in Business Management program from 2013 to 2018.  (*Id.* ¶¶ 27, 198-99.)  "In 2013, prior to her enrollment, Plaintiff Proffitt received a Roadmap Summary document from Capella.  This document was created by Capella as 'an estimate to assist you with your enrollment decision.'  The Roadmap Summary stated that, 'The average time to completion for the Comprehensive/Dissertation phase is approximately two years.'" (*Id.* ¶ 200 (quoting Dkt. 217-4, Ex. 18).)  "Plaintiff Proffitt relied upon these representations when enrolling at Capella, and when re-enrolling each term." (*Id.* ¶ 202.)

---

[9]   The citation in paragraph 190 appears to be an error; the cited email is Docket Entry 218-18, Ex. 28 at 2.

"These representations were false." (*Id.* ¶ 203.)  "Capella admitted in December 2014 that this program was actually 'designed to take 57 months,' with 'fewer than 10 students' actually completing the program in 2013-2014 . . . ." (*Id.* ¶ 204 (quoting Dkt. 2175, Ex. 43).)

Plaintiff Proffitt began the dissertation process but "suffered many delays, received inconsistent feedback and instructions, and was guided incorrectly by her doctoral capstone/dissertation committee." (*Id.* ¶¶ 205-06, 208.)  "Plaintiff Proffitt was misled on how her dissertation should proceed by numerous Capella employees who led her to believe she needed a quantitative dissertation, rather than a qualitative dissertation. Because of this, she focused her coursework on quantitative methodologies." (*Id.* ¶ 207.) "However, after two years of working with the same mentor and making no progress, Plaintiff Proffitt changed to a new mentor who had her change her topic to a qualitative dissertation.  The years she spent working on a quantitative rather than a qualitative dissertation delayed her progress towards her degree." (*Id.*)  "Despite the promise that the 'average' student completed his or her PhD, Plaintiff Proffitt was forced to withdraw without receiving her doctoral degree." (*Id.* ¶ 209.)

For each of the six new plaintiffs, as well as Plaintiff Ornelas, the Proposed SAC alleges:

> Had Capella not misrepresented the success rate, timeline, costs, hurdles to obtaining a doctoral degree, or had it disclosed its true scheme, [the Plaintiff] would not have enrolled at Capella or paid for the educational services offered by Capella, including incurring student loans.
>
> Had [the Plaintiff] not been misinformed about Capella's completion rate or been made aware of Capella's abysmally low completion rate, [the Plaintiff]

would not have enrolled in the doctoral program or paid the tuition, supply
costs, and other fees charged by Capella, or incurred student loans.

(*Id.* ¶¶ 114-15, 131-32, 148-49, 163-64, 180-81, 196-97, 210-11 (paragraph numbers
omitted).)

### 5.    New Subclasses

The Proposed SAC retains the Nationwide Class under Minnesota law defined as
"All current or former students within the United States who enrolled in and paid tuition
for a doctoral degree program at Capella University from 2006 until the present and did
not receive full reimbursement for tuition, costs and student loans from Defendants (the
'Class')." (*See* Dkt. 215 ¶ 214.)  Alternative allegations related to subclasses represented
by the plaintiffs who were dismissed from this action are removed.  (*Id.* at 81-83.)  The
Proposed SAC alternatively alleges new subclasses of students within certain states
corresponding to the states of and represented by the six new plaintiffs, in addition to the
existing "Massachusetts Class" represented by Ornelas.  (*See* Dkt. 216 ¶ 215.)

The Proposed SAC further alternatively alleges new "Nationwide Subclasses" of
"current or former students," under Minnesota law, based on (1) Capella's various
schools (Schools of Public Service Leadership/Human Services/Public
Safety/Psychology, School of Nursing, School of Business and Information Technology,
and School of Education) and a student having received a communication from an
enrollment counselor, or (2) a student having received certain publications about
Capella's doctoral programs, each represented by the plaintiff(s) who attended that

program and/or received that communication or publication.  (*Id.* ¶ 216.)  For example,

one of the proposed subclasses based on specific schools is alleged as follows:

> Under Minnesota law, by Plaintiff Ornelas, the "Schools of Public Service
> Leadership/ Human Services/Public Safety/Psychology" nationwide class:
>
> All current or former students who received a communication from an
> enrollment counselor from the Schools of Public Service Leadership, Human
> Services, Public Safety, or Psychology (including but not limited to a "typical
> learner" email), who then later enrolled in and paid tuition for a doctoral
> degree program at Capella University from 2006 until the present and did not
> receive full reimbursement for tuition, costs and student loans from
> Defendants.

(*Id.* ¶ 216(a).)  Similarly, one of the proposed subclasses based on a specific publication

is alleged as follows:

> Under Minnesota law, by Plaintiff Proffitt, the "Roadmap Summary"
> nationwide class:
>
> All current or former students who received a "Roadmap Summary" from
> Capella, who then later enrolled in and paid tuition for a doctoral degree
> program at Capella University from 2006 until the present and did not receive
> full reimbursement for tuition, costs and student loans from Defendants.

(*Id.* ¶ 216(e).)  A similar "Brochure" nationwide subclass is also alleged.  (*See id.*

¶ 216(f).)

### 6.    Changes to and New Causes of Action

The Proposed SAC removes causes of action for legal claims that were dismissed

and/or for claims represented by plaintiffs who were dismissed by the May 6, 2019

Order.  (*See, e.g.*, Dkt. 215 at 91-94, 99-135, 136-38, 142, 144-47, 151, 162, 173-77, 180-

94.)  The existing claims for fraud in the inducement under Minnesota common law (First

Cause of Action in the Proposed SAC); violation of Minnesota Uniform Deceptive Trade

Practices Act, Minn. Stat. § 325D.44 (Second Cause of Action); and violation of the

Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69 (Third Cause of

Action) are brought, in addition to on behalf of the Nationwide Class as in the FAC,

alternatively by the various Nationwide Subclasses defined in Paragraph 216.  (*See* Dkt.

216 at 53, 54, 57; *see also, e.g.*, Dkt. 215 ¶¶ 230, 236, 246, 253, 266 (adding subclasses

to existing allegations).)  One of the allegations in the First Cause of Action, by the

Nationwide Class or Subclasses for fraud in the inducement under Minnesota law, adds

"misrepresented and" to an allegation stating that Capella "concealed the actual

percentage of students who graduated with doctoral degrees from Capella."  (*See* Dkt.

215 ¶ 237.)

The causes of action for fraud in the inducement under Massachusetts common

law and violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch.

93A, brought by Ornelas and the alternative Massachusetts subclass, also remain (Fourth

and Fifth Causes of Action).  (*Id.* at 135, 140.)  Similar to the change in the First Cause of

Action, one of the allegations in the Fourth Cause of Action, for fraud in the inducement

under Massachusetts law, adds "misrepresented and" to an allegation stating that Capella

"concealed the actual percentage of students who graduated with doctoral degrees from

Capella."  (*See id.* ¶ 274.)

Other than the revisions noted above, the First through Fifth Causes of Action are

unchanged from the FAC, except they all now conclude with an allegation stating,

"Defendants' conduct also warrants punitive damages."  (Dkt. 216 ¶¶ 244, 259, 268, 281,

295.)

The Proposed SAC then adds causes of action brought by each of the new alternative state-based subclasses (*see id.* ¶ 215) for (1) fraud in the inducement under each state's common law and (2) violations of each state's deceptive trade, unfair trade, and/or consumer sales practices statutes. (*Id.* at 64-95 (Florida, Sixth and Seventh Causes of Action; Idaho, Eighth and Nineth Causes of Action; Utah, Tenth and Eleventh Causes of Action; Illinois, Twelfth and Thirteenth Causes of Action; Minnesota, Fourteenth, Fifteenth, and Sixteenth Causes of Action; Arizona, Seventeenth and Eighteenth Causes of Action; and Michigan, Nineteenth and Twentieth Causes of Action).) Each of the claims for fraud in the inducement brought in the alternative on behalf of a state-based subclass are nearly identical to each other, changing only the plaintiff's name, the subclass name, and the state common law. (*Compare id.* ¶¶ 269-81 (Fourth Cause of Action, Massachusetts), *with id.* ¶¶ 296-308 (Sixth Cause of Action, Florida), 323-35 (Eighth Cause of Action, Idaho), 350-62 (Tenth Cause of Action, Utah), 377-89 (Twelfth Cause of Action, Illinois), 404-18 (Fourteenth Cause of Action, Minnesota), 445-59 (Seventeenth Cause of Action, Arizona), 475-87 (Nineteenth Cause of Action, Michigan).) Except, the allegations for the Fourteenth and Seventeenth Causes of Action (Minnesota and Arizona) include two paragraphs that do not appear in the other causes of action, which state, "Capella intentionally misled Plaintiff with promises that his program would take a shorter time than the programs actually took. Similar, if not identical, false representations and omissions were made by Capella to other members of the Class about Capella's degree programs." (*Id.* ¶¶ 409-10, 450-51 (paragraph numbers omitted).) Similarly, the state statutory claims brought in the alternative on behalf of a state-based

subclass are nearly identical to each other, changing only the plaintiff's name, the subclass name, and the state statute. (*Compare id.* ¶¶ 282-95 (Fifth Cause of Action, Massachusetts), *with id.* ¶¶ 309-22 (Seventh Cause of Action, Florida), 336-49 (Nineth Cause of Action, Idaho), 363-76 (Eleventh Cause of Action, Utah), 390-403 (Thirteenth Cause of Action, Illinois), 488-501 (Twentieth Cause of Action, Michigan).) Except, once again, the two Minnesota and the Arizona statutory claims are similar to the others but include some different and/or additional allegations. (*See id.* ¶¶ 419-44 (Fifteenth and Sixteenth Causes of Action, Minnesota), 460-74 (Eighteenth Cause of Action, Arizona).)

As in the First through Fifth Causes of Action, all of the new causes of action conclude with an allegation stating, "Defendants' conduct also warrants punitive damages." (*Id.* ¶¶ 308, 322, 335, 349, 362, 376, 389, 403, 418, 433, 444, 459, 474, 487, 501.) A request for "punitive and/or exemplary damages due to Defendants' behavior" has also been added to the Prayer for Relief. (*See* Dkt. 215 at 195.)

## C.     The Scheduling Order

The first Scheduling Order, entered on September 11, 2019, stated that "[a]ll motions which seek to amend the pleadings to add parties and claims must be served and filed on or before this date [of 30 days after the Court rules on class certification]," but "[t]his deadline does not apply to motions which seek to amend the complaint to add a claim for punitive damages," which "must be brought on or before the non-dispositive

motion deadline."[10]  (Dkt. 72 at 2.)  Those amendment deadlines were not altered by any of the subsequent amendments to the Scheduling Order and remain in effect.  (*See* Dkts. 104, 203, 209, 240.)

When the Motion to Amend was filed on October 5, 2020 (Dkt. 210), the operative Pretrial Scheduling Order in this case set the deadline for class-certification fact discovery as October 5, 2020 (Dkt. 209 at 1).  Deadlines for class certification-related expert disclosures, expert discovery, and non-dispositive motions were set for various dates from October 19, 2020 through January 4, 2021.  (Dkt. 209 at 1-2.)  The deadline for class certification motions was February 22, 2021.  (*Id.* at 2.)

While the Motion to Amend was pending, the parties jointly moved for and the Court granted modifications to the Scheduling Order vacating all class-certification and related dates and ordering the parties to file a joint proposed Scheduling Order within seven days after the Court ruled on the Motion to Amend.  (Dkt. 240.)

## II.    LEGAL STANDARD

Rule 15 sets the general standard for amending pleadings in Federal court and provides that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*, *Niagara of Wisc. Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).

---

[10]    U.S. Magistrate Judge Steven E. Rau entered the Scheduling Order (Dkt. 72), and this case was re-assigned to the undersigned on November 15, 2019, after Magistrate Judge Rau passed away (Dkt. 88).

The Eighth Circuit has held that although amendment of a pleading "should be allowed liberally to ensure that a case is decided on its merits, there is no absolute right to amend." *Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citations omitted).  Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (citation omitted) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile.").

### III.   <u>ANALYSIS</u>

Defendants oppose the Motion to Amend on grounds of timeliness, prejudice, and futility.  (Dkt. 229 at 7-9.)  Plaintiff contends that there has been no undue delay, Defendants will not suffer prejudice, and the amendments are not futile, and the Motion to Amend should be granted under the standard of Rule 15(a)(2).  (Dkt. 212 at 4.)  The Court addresses each of these issues.

### A.   **Timeliness**

Plaintiff argues there has been no undue delay in filing the Motion to Amend, as "discovery is still currently underway," documents produced in discovery have "yielded additional evidence to prove his claims and what should be the proper scope of the class," and "the Scheduling Order allows amending of the complaint and adding of parties until after the Court rules on a motion for certification."  (Dkt. 212 at 4 (citations omitted).)  Plaintiff also argues (and Defendants do not dispute) that the Motion to Amend is timely

28

under the Scheduling Order.[11]  (*See id.* at 4.)  Rather, Defendants argue that the Motion to

Amend is not timely because it was made "30 months after [Plaintiff] filed the original

complaint in April 2018, and at the tail end of over a year of class discovery," and

because "Plaintiff has long known about the facts that form the basis for his Proposed

SAC, yet he waited until the very last day of class-related fact discovery to add them."

(Dkt. 229 at 12.)

Denial of leave to amend may be justified by undue delay.  *Sanders*, 823 F.2d at

216 (citation omitted).  "Delay is undue when it places an unwarranted burden on the

Court or when the plaintiff has had previous opportunities to amend."  *Grage v. N. States

Power Co.*, 12-CV-2590 (JRT/JSM), 2014 WL 12610147, at *5 (D. Minn. Jan. 3, 2014)

(cleaned up).  Generally, delay alone is insufficient unless it results in prejudice.

*Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001); *Chestnut v. St. Louis

Cnty.*, 656 F.2d 343, 349 (8th Cir. 1981).

---

[11]     Several of the cases Defendants cite in their timeliness argument (Dkt. 229 at 14-
15) are cases addressing motions to amend that were not timely under a scheduling order
and had to meet Rule 16's higher "good cause" standard.  *See Popoalii v. Correctional
Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008); *Promotional Mktg. Insights, Inc. v.
Affiliated Comput. Servs., Inc.*, 2013 WL 4747261, at *3-5 (D. Minn. July 19, 2013);
*Borchardt v. State Farm Fire & Cas. Co.*, 2017 WL 8315883, at *7-9 (D. Minn. Apr. 26,
2017).  Here, Rule 16 does not apply because the Motion to Amend was brought within
the deadline set by the scheduling order.  Other cited cases denied amendment where the
motion was brought after the defendant had moved for summary judgment, *Hammer v.
City of Osage Beach*, 318 F.3d 832, 844-45 (8th Cir. 2003), or the case was much closer
to trial, *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 224-26 (8th Cir.
1993) (less than three weeks before the trial date).  Those circumstances are not present
here.

Regarding the timing of the Motion to Amend in relation to Plaintiff's knowledge of the facts underlying the amendments, Defendants argue that, contrary to Plaintiff's assertion that the amendments are based on information received in discovery, "review of the record shows that plaintiff's counsel has in fact been in possession of the vast majority of this 'additional evidence' for 9-10 months now." (Dkt. 229 at 12 (citing Dkt. 212 at 4).) In particular, Defendants identify document productions that included evidence Plaintiff now relies on in the Proposed SAC, or included "a version" of such documents, in December 2019, January 2020, and July 2020. (*Id.* at 13.) Plaintiff responds that the new allegations in the Proposed SAC are based on not only documents produced in discovery, but "counsel's ongoing investigation," and counsel also noted at the hearing that one of the new plaintiffs only became a client in mid-September of 2020. (*See* Dkt. 212 at 2.) Counsel also explained at the hearing that the Motion to Amend was brought once counsel had found a plaintiff to represent each school at Capella, indicating that at least some of the amendments could have been sought earlier.

However, Defendants have previously argued that the sole remaining Plaintiff (Ornelas) was told the time it takes a "typical learner . . . averaging 2 courses per quarter" to complete the PhD in Public Safety program and that discovery therefore should be limited to emails representing the "average" completion time of the PhD in Public Safety program rather than those providing a "normal[]" or "usual[]" completion time for all doctoral programs. (*See, e.g.*, Dkt. 89 at 14-16 (asserting "the only representations relevant to this case after the motion to dismiss relate to the length of time it takes a typical learner to complete Capella's Ph.D. in Public Safety program, not Capella's

doctoral degree programs generally," asserting discovery about non-PhD doctoral programs was irrelevant, but "nonetheless" agreeing to produce discovery about other PhD programs but not non-PhD doctoral programs); Dkt. 184 at 17 ("[T]he only claims that remain are based on a representation Mr. Ornelas received as to the time it takes a 'typical learner . . . averaging 2 courses per quarter' to complete the Ph.D. in Public Safety program.  Plaintiff's requests concern statements that are outside that scope. Plaintiff seeks communications where prospective doctoral students were told that the time to completion for an academic program was 'normally' or 'usually' some period of time.  But Ornelas did not receive representations about the normal or usual completion time, and he does not have standing to represent individuals who received those communications.  Those different representations are therefore irrelevant to class certification.") (citations omitted).)  In view of these facts, and in the absence of undue prejudice to Defendants resulting from the delay (as discussed in Section III.B), the Court concludes that while it appears Plaintiff may have been able to bring the Motion to Amend earlier (or at least some version of it), this does not support a finding of undue delay.

Regarding the timing of the Motion to Amend in relation to the timeline of the case generally, Defendants further argue that Plaintiff's assertion that "discovery is currently underway" "is true only in the most technical sense," as Plaintiff filed the Motion to Amend on the day of the close of class-related discovery, and that the suggestion "that the parties could reasonably expect to complete discovery within the existing schedule . . . is misleading and disingenuous."  (Dkt. 229 at 14 (citing Dkt. 212

at 4).)  While the Court agrees that class-related discovery was "still underway" only in a technical sense as the Motion to Amend was filed on the last day, the Court is not persuaded that the status of discovery warrants denial of the Motion to Amend.  While additional discovery will be required by the proposed amendment, the Court has considerable discretion both in granting leave to amend and in establishing deadlines in a scheduling order and so can, in appropriate cases, extend the time for discovery after granting a motion to amend.  *See, e.g.*, *Niagara of Wisc. Paper*, 800 F.2d at 749; *Shank v. Carleton Coll.*, 329 F.R.D. 610, 614 (D. Minn. 2019) (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006)).

Defendants also call attention to the overall age of the case.  (Dkt. 229 at ("After more than two and a half years of litigation, . . .  plaintiff moved to amend."); *id.* at 12 ("Plaintiff's motion comes **30 months** after he filed the original complaint in April 2018 . . . .").)  The first year of this case was spent addressing Defendants' motions to dismiss, and discovery did not begin until approximately 14 months before the Motion to Amend was filed.  (*See* Dkt. 57 (Order on Motion to Dismiss filed May 5, 2019); Dkt. 66 (Rule 26(f) Report filed Aug. 15, 2019).)  Further, Plaintiff was required to file motions to compel to obtain documents (Dkts. 82, 132), which required at least one extension of the schedule (Dkt. 101), and Defendants sought other extensions (sometimes jointly with Plaintiff), including due to the COVID-19 pandemic (Dkts. 111, 115, 199, 206).  The age of the case on its own is not dispositive—context matters.  *See Benson v. Fischer*, No. 16-CV-509 (DWF/TNL), 2019 WL 3562693, at *7 n.4 (D. Minn. Aug. 6, 2019) (denying motion to amend under Rule 15(a)(2) but noting that motion was timely and defendants'

timing arguments were not convincing because first nine months of litigation were spent addressing two motions to dismiss filed by defendants, followed by a long stay).  Based on this context, the age of the case does not render the Motion to Amend unduly delayed.

In sum, the Court concludes that Plaintiff did not unduly delay, as required by Rule 15, in bringing the Motion to Amend.  *See Sanders*, 823 F.2d at 216.  Moreover, delay alone is usually insufficient unless it results in prejudice, *see Chestnut*, 656 F.2d at 349, and, as the Court explains in Section III.B, the proposed amendments do not result in unfair prejudice to Defendants.[12]

## B.    Prejudice

Plaintiff argues that "[t]he new allegations proposed by this motion will not prejudice defendants," because both the FAC and Proposed SAC "seek to redress the

---

[12]    Indeed, several of the cases Defendants cite in their timeliness argument (Dkt. 229 at 12, 14-15) were decided because the delay resulted in undue prejudice, which, as discussed in Section III.B.1, requires a showing of more than the need for additional discovery.  *See Williams*, 21 F.3d at 224-25 (affirming denial where plaintiff filed motion to amend less than three weeks before trial and addition of new defendants, with no prior notice of the suit, would have resulted in undue prejudice to new defendants, and plaintiff and counsel were dilatory); *Cognex Corp. v. VCode Holdings, Inc.*, 2007 WL 9734969, at *3-4 (D. Minn. Apr. 9, 2007) (finding "no pattern of previous failures to cure," but "ample reason to conclude that the proposed amendment will result in unfair prejudice," as "defendants could have brought their motion at an earlier time, consistent with due diligence," and "[i]t is unfair, at this stage of proceedings, for the defendants to redefine the entire scope of the case and the discovery required"); *Wanzek Constr., Inc. v. Bootheel Ethanol, LLC*, No. CV 06-1649 (DWF/AJB), 2008 WL 11348486, at *2 (D. Minn. Apr. 16, 2008) (quoting *Roberson*, 241 F.3d at 995) (noting that delay alone is not enough to deny leave to amend and unfair prejudice must result from the delay, and concluding that "the prejudice to Plaintiffs should the Court grant Defendants motion is substantial," because "fact discovery has closed, Plaintiffs have already filed for summary judgment, and the trial-readiness date is less than three months away").

same course of conduct by defendants, seek to represent the same class, pertain to the same misrepresentations and cover the same class period." (Dkt. 212 at 6-7 (footnotes omitted).) Plaintiff further argues, "The proposed amendments simply add allegations of several additional false or misleading statements made by defendants, the fact that these were form or template emails that were sent to thousands of prospective students, and that such misrepresentations were sent to prospective students in every school offering doctoral programs at Capella." (*Id.* at 7 (citations omitted).) Defendants argue that allowing the amendments would be unduly prejudicial because "Plaintiff's amendment would introduce 6 new plaintiffs and 15 new causes of action, not to mention expand the existing causes of action to include additional factual allegations," which "would involve new theories of recovery and impose additional discovery requirements and would require this court to reopen discovery to allow for full and fair adjudication of those claims." (Dkt. 229 at 16 (internal marks and citations omitted).) The Court addresses each of Defendants' arguments.

### 1.    Prejudice from Discovery

Defendants argue that "[a]t a minimum, the amendments proposed by plaintiff would entail additional discovery on the 6 additional named plaintiffs," which Defendants contend must address several issues and includes internal investigation, written discovery, and depositions. (Dkt. 229 at 17-18 (raising questions of commonality and adequacy).) Defendants also take issue with Plaintiff's assertion that the allegations raised on behalf of the new proposed subclasses pertain to the same or substantially

similar misrepresentations, arguing that they are not similar.  (*Id.* (citing Dkt. 212 at 6-7).)

Denial of leave to amend may be justified by unfair prejudice to the opposing party.  *Sanders*, 823 F.2d at 216 (citation omitted).  Having to take or respond to discovery does not on its own constitute unfair prejudice.  *Brown v. Pfeiffer*, No. 019CV03132MWWKMM, 2020 WL 1164594, at *4 (D. Minn. Mar. 11, 2020) (quoting *Dennis v. Dillard Dep't Stores, Inc.*, 207 F.3d 523, 525 (8th Cir. 2000)) ("Denial of leave to amend is not appropriate when unfair prejudice is claimed merely because the non-moving party would have the 'burden of undertaking discovery.'").  Further, the posture of this case is quite different from that in the cases cited by Defendants, where the proposed amended complaint adding a new claim was inconsistent with the district court's order directing the plaintiff to narrow the scope of her claims, *Blakley v. Schlumberger Technology Corp.*, 648 F.3d 921, 932 (8th Cir. 2011), or would have been futile (in addition to requiring additional discovery and delaying proceedings), *McAninch v. Wintermute*, 491 F.3d 759, 766-67 (8th Cir. 2007).

Here, the burden of additional discovery appears to be minimal.  At the hearing, Plaintiff's counsel represented that they would not need to take any additional discovery, would offer the new plaintiffs for depositions, and had already collected documents from almost all of those plaintiffs based on Defendants' previous discovery requests. Defendants' counsel in turn represented that the discovery they needed could be completed in two to three months.  Defendants' counsel also represented that the parties had agreed to adjourn expert discovery—which was otherwise scheduled to occur

between October and December 2020 (*see* Dkt. 209)—pending the outcome of the Motion to Amend, which alleviates Defendants' concern that expert work would have to be "revisited" (*see* Dkt. 229 at 16).  The Court subsequently vacated all class certification and related deadlines pending the outcome of the Motion to Amend (Dkt. 240), further alleviating Defendants' concerns about the approaching deadlines for class certification (*see* Dkt. 229 at 18).

Although Defendants will have the burden of undertaking further discovery and the case will suffer a short delay while the parties complete class certification fact discovery, the Court concludes that the resulting burden on Defendants does not constitute unfair prejudice.  *See Sanders*, 823 F.2d at 216.

### 2.    Prejudice from New Causes of Action

Defendants next argue that "contrary to plaintiff's claims, there are many substantive differences between plaintiff's current causes of action and his 15 proposed new causes of action," and so the new causes of action are prejudicial.  (Dkt. 229 at 19-20.)

Though "when late tendered amendments involve new theories of recovery and impose additional discovery requirements, courts are less likely to find an abuse of discretion [in not allowing amendment] due to the prejudice involved," "[c]ases in which an abuse of discretion has been found generally involve amendments based on facts similar to the original complaint."  *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (collecting cases).

The Court first questions whether there are truly "fifteen" new causes of action for purposes of unfair prejudice, as three of the Proposed SAC's causes of action (Fourteenth, Fifteenth, and Sixteenth Causes of Action) (*see* Dkt. 216 ¶¶ 404-44) are brought under the same Minnesota law(s) as causes of action that appeared in the FAC (*see* Dkt. 24 ¶¶ 248-61, 281-302).  The Proposed SAC merely adds causes of action brought by a particular proposed plaintiff on behalf of an alternative state class, rather than the Nationwide Class, and Defendants have not explained how this is prejudicial. The Court further notes that the causes of action under Florida law in the Proposed SAC (*see* Dkt. 216 ¶¶ 296-322) invoke the same law—Florida common law fraud in the inducement and the Florida Deceptive and Unfair Trade Practices Act—as two causes of action in the FAC (*see* Dkt. 24 ¶¶ 384-95, 415-426).  Although the Florida law claims in the FAC were dismissed over a year before the Motion to Amend was filed, Defendants would not be starting from scratch with respect to claims under Florida law.

Still, that leaves ten new claims among the fifteen new causes of action. Defendants contend that some of the new claims, both common law and statutory, have different elements from those already in the case.  (Dkt. 229 at 19-20.) The differences identified by Defendants, for example, the requirement to prove ignorance of a statement's falsity or "right to rely" on a statement, do not appear meaningful for purposes of prejudice, and other than reciting the elements, Defendants do not identify what prejudice results from those differences.  (*See id.*)  Defendants also suggest that claims under the Michigan Consumer Protection Act and Idaho consumer-protection statute are barred, resulting in prejudice to Defendants.  (*See id.* at 20.)  While there may

be some merit to those arguments, as they were not raised in connection with futility and because the parties did not fully brief the issue, the Court declines to find prejudice based on those arguments. Defendants may raise those arguments in a motion to dismiss, should they choose to bring one, or a motion for summary judgment. Finally, at the hearing, Defendants' counsel noted that the different state laws may affect the class certification analysis but suggested that the differences would not change the scope of discovery during the class certification phase. Accordingly, there does not appear to be unfair prejudice resulting from the difference in state laws.

In sum, Defendants have known from the outset that Plaintiff sought to represent a nationwide class but also allege alternative state-specific subclasses corresponding to the named plaintiffs. Given Defendants' position that Ornelas only has standing to represent (at most) PhD students who received "typical learner . . . averaging 2 courses per quarter" communications (Dkt. 89 at 15; Dkt. 184 at 17), it is unsurprising that Plaintiff now seeks to add doctoral students from a variety of Capella's schools, resulting in additional claims under those students' state laws. Moreover, merits discovery has not yet begun, class certification motions will be filed in due course, and trial is a long way off, in contrast to some cases where leave to amend was denied. *See Bell*, 160 F.3d at 454 (affirming denial of leave to amend where motion was filed five weeks before trial and citing cases where denying leave for "late tendered amendments" within a couple of months of trial was not an abuse of discretion). The Court therefore finds Defendants have not shown unfair prejudice resulting from the addition of the new causes of action at this stage.

### 3.   Prejudice from New Factual Allegations

Defendants finally argue that "plaintiff's expansion of his existing causes of action is . . . prejudicial because it raises new factual allegations," namely that "(1) that Capella made affirmative misrepresentations about graduation rates; and (2) that Capella misrepresented the time to complete the dissertation phase of the doctoral program, in addition to time to complete the program as a whole." (Dkt. 229 at 21.)  Defendants argue, "These new factual allegations were never previously part of the case, and would be unduly prejudicial to add at this late stage after class discovery has closed." (*Id.*)

The Court does not find the difference between asserting claims based on misrepresentations about overall time to complete a program and claims based on misrepresentations about the time to complete the dissertation phase so important as to result in unfair prejudice.  Indeed, the FAC alleges that the dissertation phase was the cause of the delayed time to completion.  (*E.g.*, Dkt. 24 ¶ 3 ("After having invested significant amounts of time and money in completing their coursework, doctoral students began the dissertation/capstone process, the second and final step in obtaining a doctoral degree.  However, this is when serious delays began."); *id.* ¶¶ 197-202 (describing delays in Ornelas's dissertation phase).)  While this phase was not specifically identified in the Causes of Action, it is not plausible that Defendants did not realize that the length of the dissertation phase of doctoral programs would be relevant to this case.

As for graduation rate, the FAC alleges that "Capella appears to have an abysmal graduation rate for doctoral students; less than 10% of its doctoral student population graduates with a doctoral degree" and "with an expected graduation rate likely under

10%, the 'typical' Capella student does not complete a PhD program in 'three years';
rather, the typical Capella student is forced to leave without a degree, tens-of-thousands-
of-dollars in debt." (*Id.* ¶¶ 60, 69.) Although the May 6, 2019 Order dismissed the
fraudulent omission graduation rate claim, Capella's graduation rate is intertwined with
the current "time to completion" causes of action because whether a student ever
completes a doctoral program is directly related to the graduation rate. Moreover,
Plaintiff does not seek to add a standalone "graduation rate" claim or subclass; rather,
Plaintiff seeks to add allegations regarding graduation rate to causes of action that are
also based on misrepresentations about time to completion. Accordingly, the Court finds
no undue prejudice from adding allegations relating to graduation rate.

## C.    Futility

Defendants argue that the Motion to Amend "should also be denied because the
proposed amendments assert claims that are futile," as "the Proposed SAC cannot survive
a motion to dismiss: the amendments are deficient, including on the same grounds
identified by the Court in its prior order on Capella's motion to dismiss, and plaintiff has
failed to support his claim for punitive damages." (Dkt. 229 at 22-23.) Plaintiff argues
that "[t]he existing operative complaint was upheld" in the Order on the Motion to
Dismiss and "the proposed changes constitute additional detail to an already sufficiently
pled complaint," so "the question as to whether amendment would be futile is moot."
(Dkt. 212 at 5-6.)

1.      **Legal Standard**

"Denial of a motion for leave to amend on the basis of futility means the district

court has reached the legal conclusion that the amended complaint could not withstand a

motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Accordingly, in reviewing a denial of leave to amend we ask whether the proposed

amended complaint states a cause of action under the *Twombly* pleading standard . . . ."

*Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation and marks omitted); *see*

*also Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 511 (8th Cir. 2012) ("[W]hen

the court denies leave on the basis of futility, it means the district court has reached the

legal conclusion that the amended complaint could not withstand a motion to dismiss

under Rule 12(b)(6) . . . .") (cleaned up).

To survive a Rule 12(b)(6) motion to dismiss, a claim "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  Analysis under Rules 15 and 12(b)(6) generally requires a

court not consider matters outside the pleadings to determine whether leave to amend

should be given.  *See Arias v. Am. Family Mut. Ins. Co.*, No. CV 13-1681 (PJS/JJG),

2013 WL 12145854, at *2 (D. Minn. Oct. 28, 2013) (citing *Casazza v. Kiser*, 313 F.3d

414, 417 (8th Cir. 2002)) (finding "[n]o matters outside the pleading may be considered"

when conducting a futility analysis under Rules 12(b)(6) and 15).  Further, "a motion to

amend should be denied on the merits only if it asserts clearly frivolous claims or defenses." *Becker v. Univ. of Neb. at Omaha*, 191 F.3d 904, 908 (8th Cir. 1999) (internal quotation marks and citation omitted).  In other words, the "[l]ikelihood of success on the new claim or defenses is not a consideration for denying leave to amend unless the claim is clearly frivolous." *Becker*, 191 F.3d at 908 (citations omitted).

Additionally, when a claim is for fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*  "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (cleaned up).  "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013) (cleaned up).  "The purpose of Rule 9(b) is to provide the defendant with notice of and a meaningful opportunity to respond specifically to charges of fraudulent conduct by apprising the defendant of the claims against it and the facts upon which the claims are based." *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2013 WL 3717743, at *6 (D. Minn. July 15, 2013) (citing *Com. Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)).  "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the

rule." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (cleaned up). "But Rule 9(b) does not require that the exact particulars of every instance of fraud be alleged, so long as the complaint includes enough detail to inform the defendant of the core factual basis for the fraud claims." *Ransom v. VFS, Inc.*, 918 F. Supp. 2d 888, 898 (D. Minn. 2013) (cleaned up). Ultimately, "[t]he level of particularity required depends on the nature of a case." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (citing *BJC Health Sys.*, 478 F.3d at 917).

## 2.   Defendants' General Futility Arguments

Defendants make several targeted arguments regarding futility, which the Court addresses in Sections III.C.3-7, but they begin with the generalized argument that "[t]he claims in plaintiff's Proposed SAC fail to state a claim for relief, including, in some instances, for the same reasons the Court identified in its May 2019 Order on Capella's Motion to Dismiss." (Dkt. 229 at 23.) Defendants recount some of the analysis in that Order and then state:

> Though the vast majority of plaintiff's claims were dismissed over 17 months ago, plaintiff's amendment seeks to revive claims that repeat the deficiencies of the prior dismissed claims. Indeed, each of the proposed new plaintiffs' claims suffers from fatal flaws that could not survive a motion to dismiss. While Capella would expand on its arguments on a motion to dismiss, the following flaws illustrate why the Court should deny plaintiff's motion to amend as futile.

(*Id.* at 23-24 (discussing Dkt. 57).) Thus, it appears that Defendants believe there are "fatal flaws" with the Proposed SAC that they have chosen not to raise in opposition to the Motion to Amend, and instead are holding in reserve for a motion to dismiss should the Court permit amendment. Counsel for Defendants confirmed at the hearing that they

would likely move to dismiss should the Court permit amendment.[13]  Accordingly, the

Court confines its analysis to the arguments Defendants made and developed in their

opposition to the Motion to Amend.  As one example, Defendants assert that the

graduation rate claims do not "meet the heighted pleading requirements of Rule 9(b) that

would be applicable," but do not support this assertion with any argument.  (*See* Dkt. 229

at 27.)  Because this assertion was not developed by Defendants, rendering Plaintiff

unable to respond to it, the Court will not find the claims are futile for failing to satisfy

Rule 9 at this stage in the proceedings.

### 3. Futility Due to Lack of Injury

Defendants argue that "[e]ach of the proposed new plaintiffs' claims is primarily

premised on the theory that these plaintiffs . . . were 'promised' a completion time, and

have suffered some injury by not being able to attain a degree within that time.  (Dkt. 229

at 24-25.)  Defendants first argue that these are claims "sounding in 'educational

malpractice,'" which "[c]ourts have consistently rejected," and second that "the proposed

new plaintiffs' claims fail at the outset when each chose to withdraw either before or

during the estimated completion window for their program."  (*Id.* at 25.)  Defendants

clarified in their November 3, 2020 letter to the Court that "the District Court rejected

similar arguments in connection with granting in part and denying in part Capella's

---

[13]     Regardless of the permissibility of this approach, the Court notes that the delay—
not to mention additional use of party and judicial resources—that would result from
Defendants' raising new Rule 12(b)(6) arguments in a subsequent motion to dismiss
rather than in their opposition here undermines Defendants' claims of prejudice based on
delay.

earlier motion to dismiss," but Defendants "nonetheless believe that these arguments regarding the educational-malpractice doctrine and active-enrollment times have purchase for the six new plaintiffs that are proposed to be added in the" Proposed SAC. (Dkt. 233.)

With respect to the educational malpractice argument, the May 6, 2019 Order's analysis and conclusion were as follows:

> Ornelas alleges that Capella misrepresented the average time and cost of its PhD in Public Safety program. To assess this claim, the Court need not assess the general quality of Ornelas's instructors nor the effectiveness of Capella's programs. Instead, the relevant inquiry would be tied to objective enrollment statistics. For this reason, Ornelas's common-law fraud claims are not barred by the educational-malpractice doctrine.

(Dkt. 57 at 16.) Defendants did not explain in their memorandum, in their letter, or at the hearing why a different conclusion is called for with respect to the proposed amendments. (See Dkt. 229 at 25; Dkt. 233.) The Court does not discern any aspect of Plaintiff's new allegations that requires a different conclusion. The Court rejects Defendants' educational malpractice argument.

The Court turns to Defendants' argument that the proposed plaintiffs withdrew before the projected graduation date. The Court understands that the Order on the Motion to Dismiss addressed this as a standing issue (Dkt. 57 at 3), but Defendants now present it as a "lack of injury issue"—or, as noted at the hearing, perhaps a causation or reliance issue—going to the elements of the cause of action.[14]  Nonetheless, the Court

---

[14]     Based on the hearing, this argument is one that Defendants believe would be better developed on a motion to dismiss.

finds the May 6, 2019 Order's analysis answers the injury question here: "The alleged time and money that was lost began to accrue when [two former plaintiffs] enrolled in their programs and paid tuition for them." (*Id.* at 4.) Defendants cite no case in support of the proposition that allegations of lost time and money do not sufficiently allege an injury because plaintiffs stopped accruing the losses.

Further, Defendants have not explained why the proposed plaintiffs' allegations with respect to injury are any different from Ornelas's allegations in the FAC, including the fact that Ornelas withdrew without receiving his doctoral degree and "[h]ad Capella not misrepresented the timeline, costs, hurdles to obtaining a doctoral degree, or had it disclosed its true scheme, Plaintiff Ornelas would not have enrolled at Capella or paid for the educational services offered by Capella, including incurring student loans." (Dkt. 24 ¶¶ 188, 196, 203.) The Proposed SAC alleges, for each plaintiff, "Had Capella not misrepresented the success rate, timeline, costs, hurdles to obtaining a doctoral degree, or had it disclosed its true scheme, [the Plaintiff] would not have enrolled at Capella or paid for the educational services offered by Capella, including incurring student loans." (Dkt. 216 ¶¶ 114, 131, 148, 163, 180, 196, 210.) And each cause of action alleges damages and/or injury. (*See id., e.g.*, ¶¶ 243, 256, 267, 280, 294, 307, 321 (First through Seventh Causes of Action).) The Court concludes that injury has been sufficiently alleged for the purposes of the pleading standard. These allegations, either exactly or nearly, appear in the FAC with respect to Ornelas and the Nationwide Class. (*See* Dkt. 24 ¶¶ 203, 261, 294, 302, 532, 564.) The May 6, 2019 Order found that Ornelas had stated a claim for common-law fraud, under both Minnesota and Massachusetts law, and, without relying

on whether Ornelas had stayed in the program a certain length of time, specifically stated that "Ornelas relied on this representation, he alleges, and would not have enrolled in the program had he known its true length and cost.  Finally, Ornelas's alleged damages are the time and tuition he lost by enrolling in a program that he otherwise would not have." (Dkt. 57 at 11 & n.10.)  The Court therefore rejects Defendants' lack of injury arguments.

### 4.      Futility of Graduation Rate Claims

Defendants argue that "Plaintiff's Proposed SAC also seeks to resurrect claims as to an alleged failure on Capella's part to disclose information about graduation rates, claims the Court has already found fail to plead a claim for relief" (Dkt. 229 at 26 (citing Dkt. 57 at 6 n.3)), and while the FAC framed the allegations as fraudulent omissions, "the proposed plaintiffs are seeking to reincorporate the exact same claim, except under the theory that Capella misrepresented graduation rates" (*id.*).

The Proposed SAC identifies several "form representations" as misrepresenting graduation rates, including the "typical learner" emails (Schools of Public Safety, Psychology, Public Service Leadership, and Human Services), the "typical time to completion" emails (Schools of Business and IT), and the "average degree completion" emails (School of Nursing), along with similar "CHAT" messages and "form representations made telephonically."  (Dkt. 216 ¶¶ 67-76.)  The representations at issue are:

- "Typical Learner"—"Our typical learner will complete their PhD program in 3 years, plus or minus one quarter, by averaging 2 courses per quarter . . ." (*id.* ¶ 68);

- "Typical Time to Completion"—"Typical time to completion is anywhere from 3.5 to 5.5 years to complete; 4 to 4.5 is average" (*id.* ¶ 73); and

- "Average Degree Completion"—"average degree completion" time for Capella was from 2-4 years (*id.* ¶ 75).

The Proposed SAC further alleges "[t]hese form misrepresentations all delivered the same message: 1) that the average or typical doctoral student graduated from Capella (i.e., more than 50% of its students graduated) and 2) that the timeline for graduating was relatively fast, most times under three to four-and-a-half years." (*Id.* ¶ 67.) In addition, the Proposed SAC alleges that "Capella appears to have an abysmal graduation rate for doctoral students; less than 10% of its doctoral student population graduates with a doctoral degree." (*Id.* ¶ 58.)

Defendants argue, "The Proposed SAC fails to identify a single representation by Capella about graduation rates, let alone any facts suggesting that any represented graduation rate would have been false." (Dkt. 229 at 27 (citations omitted).) At the hearing, Defendants explained that they thought Plaintiff was stretching the representations at issue too far to argue that a representation about typical or average time to complete is really a representation about graduation rate.

The Court has carefully considered whether Plaintiff can plausibly allege a representation of graduation rate based on these statements—that is, whether the statements at issue do in fact represent that the "average" or "typical" doctoral student

graduated from Capella—and concludes that they do.[15] "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Common sense leads the Court to conclude that a representation that the "average" or "typical" doctoral student completes a program in a certain amount of time is a representation that the "average" or "typical" doctoral student actually graduates from that program. Otherwise, how would she ever complete the program?

Further, Plaintiff has alleged sufficient facts to plausibly allege that Capella's representation that the "average" or "typical" doctoral student graduates is false. Plaintiff has alleged that less than 10% of doctoral students graduate with a doctoral degree based on an analysis of Capella's publicly available commencement documents. (Dkt. 216 ¶ 58.) Plaintiff argues that the use of "average" and "typical" in the statements at issue means more than 50% of Capella's doctoral students, that these statements are representations that more than 50% of Capella's doctoral students graduate, and that these statements are false because the actual graduation rate is 10% or less. (*See id.* ¶ 67.) This sufficiently alleges a misrepresentation as to graduation rate. Further, regardless of whether "average" and "typical" require a specific percentage of doctoral students, the Court may reasonably infer falsity of a representation that the "average" or "typical" doctoral student graduated if, as Plaintiff alleges, less than 10% of Capella's doctoral students graduate. Accordingly, while Capella did not state a specific graduation

---

[15]    Defendants did not argue there was any distinction between completing a doctoral program or degree and graduating from the program with the doctoral degree.

rate in the communications at issue, Plaintiff has plausibly alleged that Defendants
misrepresented the graduation rate for doctoral students by representing that graduation
(or completion of the program) actually occurs for the "average" or "typical" student.

The Court also disagrees that this a repackaging of the fraudulent omission claim
as to graduation rate dismissed by the May 6, 2019 Order.  The Proposed SAC does not
allege that Defendants fraudulently omitted Capella's low graduation rates.  It alleges that
Defendants affirmatively represented that the "average" or "typical" doctoral student
would graduate by affirmatively representing an "average" or "typical" time to
completion.  The Court grants the Motion to Amend as to the graduation rate claims.

### 5.      Futility of Dissertation Time Claims

Defendants argue that the allegations and claims on behalf of proposed plaintiff
Proffitt regarding dissertation completion times fail to state a claim for relief.  First,
Defendants contend that the allegations "fail to plead any misrepresentation *at all*"
because "the Gainful Employment disclosure cited in support of Ms. Proffitt's claim of
falsity says nothing about the average time it took to complete the entire PhD in Business
Management degree, let alone the average dissertation completion time in that program,"
and therefore Plaintiff has pleaded no facts supporting the alleged misrepresentation.
(Dkt. 229 at 28.)  Second, Defendants argue that the "Roadmap Summary" Proffitt
received that contained a representation about average dissertation times also contains
disclaimers about completion times, and that the May 6, 2019 Order dismissed claims
based on representations in documents that also contained disclaimers.  (*Id.* at 28-29
(citing Dkt. 57 at 12).)

50

As to Defendants' "no misrepresentation" argument, Plaintiff alleged that Capella represented that the "average" time to complete a dissertation was between one to two years based on certain brochures and "Roadmaps" provided to potential students. (*Id.* ¶ 80 (citing Dkt. 217-4, Ex. 16 at 13 ("Dissertation Courseroom milestones take, on average, four to eight quarters to complete."), Ex. 17 at 25 ("Dissertation Courseroom milestones take, on average, four to eight quarters to complete.")); *id.* ¶ 81 (quoting Dkt. 217-4, Ex. 18 ("The average time to completion for the Comprehensive/Dissertation phase is approximately two years.")).)

Plaintiff further alleged that "[c]onsidering 90% of Capella doctoral students did not graduate, the 'average' Capella student could not have completed the dissertation, and therefore certainly did not so do in two years." (*Id.* ¶ 82.) Plaintiff also alleged that "Capella also recognized that its dissertation process was the leading cause of doctoral students not graduating" based on an internal Capella email describing the following concern from a student as "**typical**": "I made straight As in my courses, and can't get a topic approved." (*Id.* ¶ 90 (emphasis added) (quoting Dkt. 218-17, Ex. 27 at 2).) Finally, Plaintiff alleged that "internal communications confirm Capella's knowledge that some of its programs took seven years *on average* to complete" based on an internal Capella email stating in part: "**for new learners coming into the program, the traditional Psych PhD DOES take, on average, seven years to complete with dissertation**." (*Id.* ¶ 94 (quoting Dkt. 218-20, Ex. 30 at 2) (emphasis added in Proposed SAC).) The Court concludes that the Proposed SAC contains sufficient factual allegations, including that it was "typical" for students to express concern about not getting a dissertation topic

approved, the length of the doctoral program, and that less than 10% ever completed the doctoral program, to render plausible an allegation that Capella's representations that the "average" time to complete a dissertation was between one and two years were false, and that Capella knew they were false.  The fact that the plaintiffs uniformly allege delays caused by Capella during the dissertation phase further supports the plausibility of these allegations.  (*Id.* ¶¶ 108-112 (Ornelas), ¶ 128 (Powers), ¶¶ 143-45 (Seppa), ¶¶ 158-60 (Miller), ¶¶ 176-77 (Gore), ¶¶ 192-93 (Carty), ¶¶ 206-07 (Proffitt).)

The Court considers Defendants' second argument that the Roadmap Summary provided to Proffitt contained disclaimers rendering her "dissertation time" claim futile. (Dkt. 229 at 28-29.)  In particular, the Roadmap Summary stated, "This summary statement is an estimate to assist you with your enrollment decision," "Your time to completion is contingent on the number of courses you have remaining for your chosen program and the number of courses you elect to take each quarter," and "Your individual time to completion [of the Comprehensive/Dissertation phase] may vary."  (Dkt. 17-4, Ex. 18 at 30.)

The "disclaimer" portion of the May 6, 2019 Order relied on by Defendants addressed a statement that a particular program was "designed to be completed in three years."  (Dkt. 57 at 11.)  The May 6, 2019 Order dismissed the claim as not sufficiently alleging a false representation of material fact because:

> That a program is "designed" to be completed in a certain amount of time is not false merely because the average student takes longer to complete that program.  And the course catalogue displays only a possible schedule; it does not represent the actual or guaranteed length of the program.

(*Id.* at 12; *see also id.* at 7-8 (dismissing another claim based on statement that program was "designed to be completed in three years").)  The May 6, 2019 Order then noted:

> Moreover, the course catalogue expressly disclaims that the "completion time for the dissertation courses varies."  This disclaimer also undermines Carter's allegations that the course catalogue was a false representation of the time to complete the DSW degree.

(*Id.* at 12.)

Here, however, the statement in Proffitt's "Roadmap Summary" alleged to be a misrepresentation is: "The average time to completion for the Comprehensive/ Dissertation phase is approximately two years."  (Dkt. 216 ¶ 200 (citing Dkt. 217-4, Ex. 18 at 30).)  The statement is not a description of how the program was "designed" or "structured."  As noted in the May 6, 2019 Order, there is an important difference between a representation as to an "average" time to completion and a representation of completion time based on how a program is "designed" or "structured."  (*See, e.g.*, Dkt. 57 at 8 ("Accepting Plaintiffs' allegations as true for the purpose of this motion, Capella represents that the Ed.D. program is 'designed' to take less than 3 years.  Capella does not represent that an average student would complete the degree in 3 years, nor did Capella guarantee that Kennedy, Brannen, or Matelski would complete the Ed.D. program in fewer than 3 years.  Neither the statistics contained in the Gainful Employment report nor the experiences of the Plaintiffs contradict the representation of a 3-year 'design' time.") (footnote omitted); *id.* at 9 ("**A program's structure is distinct from its average length, however**.  . . .  For these reasons, Mason and Norris do not sufficiently allege that Capella misrepresented the *average* length of the DIT or DBA

53

programs, nor do they allege that the programs were not, in fact, *structured* as 3-year programs." (bold emphasis added)); *id.* at 12 ("That a program is 'designed' to be completed in a certain amount of time is not false merely because the average student takes longer to complete that program.").)  In sum, there is a difference between a representation about a program's length as "designed" or "structured" and a representation about a program's "average" length.

The Roadmap Summary's disclaimers that it was an estimate and that time to completion may vary, including based on the number of courses taken per quarter, do not address its unequivocal statement that "[t]he average time to completion for the Comprehensive/Dissertation phase is approximately two years."  While Proffitt's conduct would affect her personal time to completion, the **average** time to completion when Capella provided the Roadmap Summary to Proffitt was already determined and would not vary based on her conduct.  If Capella told Proffitt that the average time to complete the Comprehensive/Dissertation phase was two years when it was actually longer, disclaimers about how long it might take Proffitt to finish do not cure the falsity of that representation.[16]

For all these reasons, the Court concludes that claims based on dissertation time are not futile.

---

[16]    Defendants did not make a disclaimer argument in connection with the brochures, and if they had, the Court would reject it for the same reason.

6.      **Futility of Time-Barred Claims**

Defendants argue that "some of plaintiff's claims are also plainly time barred," specifying only the claims under Florida law on behalf of proposed plaintiff Seppa (Sixth and Seventh Causes of Action), and that "[w]hen presented with such time barred claims, Courts have not hesitated to deny motions to amend as futile." (Dkt. 229 at 29-30.) According to Defendants, "Mr. Seppa's claims accrued, at the latest, in 2010 when he withdrew from his doctoral program," and so his claims were required to be brought by some time in 2014, under Florida's four-year statute of limitation. (*Id.* (citation omitted).) In response, Plaintiff alleges that "Plaintiffs did not and could not have discovered [Capella's] intentional scheme" because the information about the fraud was "hidden from the public." (Dkt. 216 ¶ 224.) Plaintiff further alleges that applicable statutes of limitations have been tolled and that Capella is estopped from relying on any such statutes. (*Id.* ¶¶ 224-29.) In other words, Plaintiff relies on delayed discovery and Capella's alleged fraudulent concealment to avoid the statute of limitations.

"Section 95.031(2)(a) of the Florida Statutes establishes a delayed discovery rule for actions founded upon fraud or constructive fraud . . . . [A] plaintiff must initiate an action 'founded upon fraud' or constructive fraud within four years of discovering the facts underlying the action, or within four years of when those facts should have been discovered with diligence." *Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 F. App'x 899, 905-06 (11th Cir. 2013) (citing Fla. Stat. § 95.031(2)(a)). However, the delayed discovery rule is "inapplicable" to Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims because those

claims are founded on statutory liability. *Id.* at 906; *see also Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017) ("The Florida legislature has set forth specific grounds for tolling limitations periods, which 'precludes application of any tolling provision not specifically provided therein.' Fraudulent concealment is not included among the grounds for tolling statutes of limitation. The Florida legislature has established a delayed discovery rule for actions founded upon fraud or constructive fraud. However, since claims under FDUTPA are founded on statutory liability, not fraud, the delayed discovery rule does not apply.") (citations omitted). Accordingly, it appears that Florida law precludes application of a delayed discovery or fraudulent concealment rule as to Seppa's FDUTPA claim but would permit application of a delayed discovery rule to his common law fraud claim.[17] The Court therefore denies the Motion to Amend as to the Seventh Cause of Action insofar as Seppa asserts a claim under the FDUTPA.

### 7.    Futility of Punitive Damages Claims

Defendants' final futility argument is directed to Plaintiff's request to add a claim for punitive damages under Minn. Stat. § 549.20. Minnesota law prohibits a party from pleading a claim for punitive damages at the commencement of a lawsuit and provides a specific mechanism for amending the complaint. Minn. Stat. § 549.191. However, the

---

[17]    "Notwithstanding the statutory grounds for tolling limitations periods, Florida courts have held that '[e]quitable estoppel can be raised to bar a defendant from unfairly claiming the benefit of the statute of limitations where a plaintiff can show that the defendant willfully induced the plaintiff to forego suit until after the limitations period has ended. However, equitable estoppel 'presupposes that the plaintiff knew of the facts underlying the cause of action but delayed filing suit because of the defendant's conduct.'" *Koski*, 347 F. Supp. 3d at 1193. However, the Proposed SAC contains no allegations plausibly supporting this conclusion as to Seppa.

Court has previously found that Rule 15, not Minn. Stat. § 549.191, applies to a motion to amend a complaint to include punitive damages in federal court when diversity jurisdiction is the basis for subject matter jurisdiction. *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 397-401 (D. Minn. 2020) (discussing that courts in the District of Minnesota "have historically applied the state statute, Minn. Stat. § 549.191, rather than Rule 15, to motions to amend to add a claim for punitive damages, in diversity actions," but "have recently taken another look at the practice . . . in view of the 2010 United States Supreme Court's decision in *Shady Grove Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)," and concluding that Rule 15 should apply). The Court therefore applies Rule 15 to Plaintiff's proposed punitive damages claims.[18]

The relevant legal basis for punitive damages under Minnesota law provides:

(a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

---

[18] Based on this conclusion, the Court rejects Defendants' argument that Plaintiff has not met the procedural requirements of Minn. Stat. § 549.191. (*See* Dkt. 229 at 32-33.)

Minn. Stat. § 549.20, subd. 1.  Under these criteria, "[a] defendant operates with 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others."  *Gamma-10 Plastics, Inc. v. Am. President Lines, Ltd.*, 32 F.3d 1244, 1255 (8th Cir. 1994).  As such, "the mere existence of negligence or of gross negligence does not rise to the level of willful indifference so as to warrant a claim for punitive damages."[19]  *Ulrich v. City of Crosby*, 848 F. Supp. 861, 868 (D. Minn. 1994) (citations omitted); *see also  Shank v. Carleton College*, 16-CV-1154 (PJS/HB), 2018 WL 4961472, at *7 (D. Minn. Oct. 15, 2018) (same), *aff'd*, 329 F.R.D. 610; *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008 (D. Minn. 2003) ("A mere showing of negligence is not sufficient to sustain a claim of punitive damages.") (cleaned up).  Moreover, plaintiffs must allege that defendants were aware of a high probability that their conduct would cause injury to plaintiffs.  *See In re McNeilus Mfg. Explosion Coordinated Litig.*, No. 17-CV-5237-PJS-KMM, 2019 WL 2387110, at *4 (D. Minn. June 6, 2019).  Put another way, the Court looks to whether the allegations in a proposed amended complaint plausibly allege that defendants knew of facts, or intentionally disregarded facts, that created a high probability that defendants' actions would harm the rights or safety of plaintiffs.

---

[19]  "Minnesota law defines gross negligence as 'without even scant care but not with such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong.'"  *Greer v. Walsh Constr. Co.*, No. CV 15-465 (PAM/JSM), 2016 WL 6892109, at *8 (D. Minn. Feb. 23, 2016) (quoting *State v. Chambers*, 589 N.W.2d 466, 478 (Minn. 1999)).

Plaintiff argues, the Proposed "SAC alleges that Capella provided inaccurate information consciously or with indifference to the high probability of injury to Plaintiffs and the Classes.  For example, the SAC provides the specific representations Capella made to each Plaintiff and evidence *from Capella* showing its knowledge of the falsity of those statements."  (Dkt. 212 at 9 (citations omitted).)  And further, "The claims for the newly added Plaintiffs in this action mirror Ornelas's claims . . . .  Therefore, sufficient support exists for Plaintiffs' claims for punitive damages."  (*Id.* at 10 (citing allegations).)  Plaintiff also states that the Proposed SAC "provides additional evidence supporting adding a claim for punitive damages," including information from internal Capella documents.  (*Id.* at 10-11.)  As described in Section I.B.6, the Proposed SAC alleges at the end of each cause of action, "Defendants' conduct also warrants punitive damages." The Court understands this to mean that all of the allegations support the punitive damages claims.

Defendants make two arguments regarding punitive damages.  First, Defendants argue, "[S]everal of his new proposed causes of action do not allow recovery of punitive damages," and provide a string citation directed at the Second, Fourth, Seventh, Eleventh, Fifteenth, Nineteenth, and Twentieth Causes of Action—one case for each cause of action with an explanatory parenthetical.  (Dkt. 229 at 30-31.)  Plaintiff did not address these points.  The Court addresses only those causes of action identified by Defendants.

Defendants are correct that punitive damages are not available for violations of the Minnesota Deceptive Trade Practices Act, so the Motion to Amend is denied as to punitive damages with respect to the Second and Fifteenth Causes of Action.  *See Constr.*

*Sys., Inc. v. Gen. Cas. Co. of Wisc.*, No. CV 09-3697 (RHK/JJG), 2010 WL 11640126, at
*4 (D. Minn. Dec. 10, 2010) ("[T]he Minnesota Uniform Deceptive Trade Practices Act
authorizes only the remedies of injunctive relief, costs, and attorney's fees.  Minn. Stat.
§ 325D.45.  Without a provision for a monetary remedy, punitive damages are not
recoverable for a violation of this statute.") (citations omitted).

       Regarding the Fourth Cause of Action, fraud in the inducement under
Massachusetts law, Defendants cite *International Fidelity Insurance Co. v. Wilson*, 443
N.E.2d 1308 (Mass. 1983), for the proposition that "punitive damages may be awarded
only by statute."  *Id.* at 1317 n.20.  Though Defendants never clearly argued that no
statute provides for punitive damages for a fraud claim under Massachusetts law, the
Court's review of Massachusetts law indicates that is the case.  *See Gravelle v. Hudson
Lock LLC*, No. 16-CV-12548-LTS, 2018 WL 627373, at *6 (D. Mass. Jan. 30, 2018)
(dismissing claims for punitive damages) ("Punitive damages are not allowed in
Massachusetts except under statutory authority.  *Santana v. Registrars of Voters of
Worcester*, 398 Mass. 862, 867 (1986).  The SAC cites no such statutory authority.");
*Flesner v. Tech. Commc'ns Corp.*, 410 Mass. 805, 813, 575 N.E.2d 1107, 1112 (1991) (in
case including misrepresentation claim, concluding that "[p]unitive damages are not
allowed in this Commonwealth unless expressly authorized by statute," and "[b]ecause
no such legislative authorization applies to this case, Flesner's claim for punitive
damages cannot stand") (citations omitted).  The Motion to Amend is denied as to
punitive damages with respect to the Fourth Cause of Action.

Defendants are correct that punitive damages are not available for violations of the FDUTPA, so the Motion to Amend is denied as to punitive damages with respect to the Seventh Cause of Action.[20]  *See Crmsuite Corp. v. Gen. Motors Co.*, No. 820CV762T02WFJAAS, 2020 WL 5898970, at *4 (M.D. Fla. Oct. 5, 2020) (citing *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984)) ("[P]unitive damages are outside the scope of FDUTPA.").

Defendants are correct that punitive damages are not available for violations of Utah Consumer Sales Practices Act, so the Motion to Amend is denied as to punitive damages with respect to the Eleventh Cause of Action.  *See Simantob v. Mullican Flooring, L.P.*, No. 2:09CV379DAK, 2010 WL 2486549, at *4 (D. Utah June 15, 2010) (quoting Utah Code Ann. § 13-11-19 (2010)) ("The UCSPA does not provide for punitive damages. . . .  As a matter of law, Plaintiff may not request punitive damages in conjunction with his claims under the UCSPA.").

As to the Nineteenth and Twentieth Causes of Action under Michigan common law and Michigan's Consumer Protection Act, the Proposed SAC claims "Defendants' conduct also warrants exemplary damages" (Dkt. 216 ¶¶ 487, 501) and seeks "punitive and/or exemplary damages due to Defendants' behavior" (*id.* at 94).  Defendants cite *Ray v. City of Detroit, Department of Railways*, 242 N.W.2d 494, 495 (Mich. Ct. App. 1975), for the proposition that "exemplary damages . . . are never allowed, however, for the purpose of punishing or making an example of a defendant." (Dkt. 229 at 31.)  As the

---

[20]    Proposed plaintiff Carty also asserted claims under the FDUTPA. (Dkt. 216 ¶¶ 309-22.)

*Ray* case notes, "The terms 'exemplary' damages, 'punitive' damages and 'vindictive' damages have frequently been confused or used interchangeably.  However, in Michigan only exemplary damages which are compensatory in nature are allowable."  242 N.W.2d at 495.  It is unclear what relief Defendants are seeking with respect to the Michigan claims, as *Ray* does not address the availability of exemplary (or punitive) damages for Michigan common law fraud claims or claims under Michigan's Consumer Protection Act.  "Michigan cases hold that exemplary damages may be allowed where the elements of fraud and malice or wanton and reckless disregard of a party's rights are involved." *Fleischer v. Buccilli*, 163 N.W.2d 637, 639 (Mich. Ct. App. 1968); *see also LePine v. Rosenbaum*, No. 19-CV-12577, 2020 WL 2836275, at *15 (E.D. Mich. June 1, 2020) ("With respect to the claim of fraud/misrepresentation in Count IV, an award of exemplary damages may be appropriate.").  However, it appears that Michigan law does not permit exemplary damages under the Michigan Consumer Protection Act.  *See Nowicki-Hockey v. Bank of Am., N.A.*, 593 F. App'x 420, 421 (6th Cir. 2014) ("As for that claim, we note that the MCPA lacks express language permitting exemplary damages.  The absence of such language in the authorizing statute—or clear legislative intent—precludes an award of exemplary damages under Michigan law.") (citing Mich. Comp. Laws § 445.911(2)).  The Court therefore concludes that Defendants have shown futility as to the request for exemplary damages in the Twentieth Cause of Action, but not the Nineteenth.

Defendants' second argument regarding punitive damages is that "plaintiff fails to allege facts sufficient to establish a claim for punitive damages" because Plaintiff has not

alleged "'(1) knowledge of or an intentional disregard of facts that make injury to the plaintiff's rights probable; and (2) action despite such knowledge.'" (Dkt. 229 at 31 (quoting *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 2017 WL 5187832, at *7 (D. Minn. July 27, 2017)).) For the first element, Defendants argue, "Plaintiff alleges that 'Capella knew its misrepresentations were false,' Proposed SAC ¶ 86, but 'the Court is not bound to accept the conclusory statement that Defendants had knowledge' of the alleged misrepresentations." (*Id.* (quoting *In re Bair Hugger*, 2017 WL 5187832, at *7 (emphasis omitted)).) On the contrary, Plaintiff has alleged more than the single conclusory statement Defendants quote. Immediately after that allegation, the Proposed SAC details Capella's knowledge of alleged misrepresentations based on deposition testimony and internal Capella documents. (*See* Dkt. 216 ¶¶ 87-96.) Moreover, the May 6, 2019 Order concluded that the allegations in the FAC regarding Ornelas sufficiently alleged Capella's knowledge: "The other elements of a common-law fraud claim also are sufficiently alleged. Ornelas alleges that Capella knew its representation was false, as Capella could make the necessary calculations for the Gainful Employment report." (Dkt. 57 at 11.) The allegations regarding the proposed new plaintiffs contain similar allegations relying on the Gainful Employment report. (*See, e.g.*, Dkt. 216 ¶ 124 (quoting Dkt. 217-5, Ex. 37).) These allegations sufficiently allege Capella's knowledge of the falsity of its representations.

As to Capella's knowledge, Defendants also argue that "plaintiff's own cited exhibit establishes that Capella did not act despite knowledge of an alleged misrepresentation; rather, an enrollment counselor discovered an issue and elevated it to

her superiors, who proceeded to investigate the concern."  (Dkt. 229 at 32 (citations omitted).)  The exhibit, which is an internal Capella email chain dated June 12, 2013, indicates that: an enrollment counselor informed her supervisors that there was data indicating the "average" cost of a PhD in IT exceeded the $75,000 "average" cost quoted to prospects by more than $25,000; one person responded by noting that "this has been brought in the past" and asking "whether it will be updated/corrected soon"; and another person then said that certain people were "checking into this."  (Dkt. 218-15, Ex. 25 at 2.)  The email chain does not indicate that Capella determined that the "average" cost of $75,000 provided to prospects was in fact correct or that Capella had in any way changed what it told prospects about the "average" cost.  Nothing in the email chain suggests Capella did anything different, and the Proposed SAC, after quoting this internal email string, alleges, "Despite knowing the $75,000 estimate was incorrect at least as early as 2013, Capella nonetheless continued using a $75,000 estimate as the average cost to complete its degrees . . . in 2014 and beyond."  (Dkt. 216 ¶ 89 (quoting Dkt. 218-15, Ex. 25 at 2; Dkt. 218-16, Ex. 26).)

In sum, the Proposed SAC adequately alleges that Capella deliberately proceeded to act in conscious or intentional disregard of, or with indifference to, the high degree of probability of injury to the rights of Plaintiff and the proposed plaintiffs.  The Motion to Amend is granted with respect to the punitive damages claims, except the Motion to Amend is denied to the extent punitive damages are claimed for the Second, Fourth, Eleventh, and Fifteenth Causes of Action, and to the extent exemplary damages are claimed for the Twentieth Cause of Action.

64

## IV.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff Maurice Jose Ornelas's Motion for Leave to File Second Amended Class Action Complaint (Dkt. 210) is **DENIED** insofar as Plaintiff seeks punitive damages for the Second, Fourth, Seventh, Eleventh, and Fifteenth Causes of Action and seeks exemplary damages for the Twentieth Cause of Action.

2.      Plaintiff Maurice Jose Ornelas's Motion for Leave to File Second Amended Class Action Complaint (Dkt. 210) is **DENIED** as to proposed plaintiff Seppa's claim under the Florida Unfair and Deceptive Trade Practices Act.

3.      The Motion to Amend is otherwise **GRANTED**.

4.      Plaintiff shall file a Second Amended Class Action Complaint consistent with this Order on **April 19, 2021**, unless an appeal of this Order is sought.  The Second Amended Class Action Complaint shall be filed under temporary seal.

5.      Defendants shall respond to the Second Amended Class Action Complaint in a manner consistent with the Federal Rules of Civil Procedure.

6.      This Order is placed under temporary seal.  The parties shall file proposed redactions to this Order on or before **April 16, 2021**.  Their filing must state whether the parties agree as to each redaction and, if the parties do not agree, provide support for each party's position as to that redaction.  The Court will then issue a redacted version of this Order, unless the Court determines no redactions are appropriate, in which case it will unseal this Order.

7.      The parties shall file a revised Joint Motion for Continued Sealing, superseding the motion at Docket Entry 235, in view of the Court's March 8, 2021 ruling on the previous Joint Motion for Continued Sealing (Dkt. 241), on or before **April 16, 2021**.

8.      The parties shall file proposed redactions to the Second Amended Class Action Complaint, or state that no redactions are required, within fourteen (14) days of the filing of the Second Amended Class Action Complaint.  Their filing must state whether the parties agree as to each redaction and, if the parties do not agree, provide support for each party's position as to that redaction.  The Court will then order the filing of a redacted version of the Second Amended Class Action Complaint, unless the Court determines no redactions are appropriate, in which case it will unseal the Second Amended Class Action Complaint.

DATED:  April 2, 2021                       *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge